Case number 23-5700, Christy Andrews v. Tri Star Sports & Entertainment Group, Inc. Oral argument not to exceed 15 minutes per side. Mr. Arsenegas, you may proceed for the appellant. Good morning, Your Honors. My name is Daniel Arsenegas. I represent the appellant, Christy Andrews, in this case. I would like to reserve three minutes for the rebuttal. We ask this court to reverse the District Court's grant of summary judgment in favor of the defendant, Tri Star Sports & Entertainment. The District Court incorrectly determined that Andrews did not have a disability as defined under the Americans with Disabilities Act. The District Court incorrectly declined to consider whether Andrews' asthma substantially impaired her immune system. Based on Tri Star's claim, it had no notice of Andrews' asthma compromising her immune system until the response in opposition to the defendant's motion for summary judgment. What's the best case you have to support your position here? Your Honor, the best case with respect to this issue is, I believe, EEOC v. J.H. Roth Packing Code 246F3D850, Your Honor. Okay. Is that cited in your brief? Yes, Your Honor. Okay. And what does it say about this kind of case? Your Honor, this is a Sixth Circuit case. There, the court reversed the District Court's grant of defendant's motion for judgment on the pleadings, holding so long as the complaint notifies defendant of the claimed impairment, which in our case would be asthma, the substantially limited major life activity need not be specifically identified in the pleading. What's your best evidence to show that this asthma is debilitating? I know a lot of people get asthma, and they can do a lot of things, and it has to be pretty severe to keep your client from working. So what's the best evidence you have in the record here? Your Honor, her testimony about how long she's had it demonstrates the duration. She's had it since she was 14 years old. Well, she's worked at jobs since that time, hasn't she? Yes, Your Honor. Okay. The difference here between this particular period of her employment history is that this was in the midst of COVID-19 and the pandemic, which is specifically a respiratory illness. And for her, it presented concerns about her ability of the respiratory system and her immune system to combat the COVID-19. Is that alleged in the complaint that her immune system was compromised by her asthma? It wasn't specifically listed as immune compromised. However, we did cite to the doctor's note in this case or the health care provider's note. I mean, if that's one of your claims, I mean, don't you have to put it in your complaint? Well, Your Honor, we did provide a – we identified asthma, which is the impairment. But saying that she's disabled because of a compromised immune system is different, I think, than just somebody that has asthma. Because not everyone that has asthma has a compromised immune system. Well, the facts of the case became clear. With respect to whether the defendant had notice is the issue that the court made its decision on. And in this case, we identified the note that – Okay. I guess you're conceding it's not pled. It's not – the word immunocompromised is not pled, Your Honor. All right. I mean, usually if a claim is not pled, we don't address it. But okay. You say they have notice, but did the decision maker have notice of the claim of a compromised immune system? Yes, Your Honor. I didn't think so. I thought that the decision maker was CEO, I guess. Correct, Your Honor. And she was not aware – at least my understanding was she's not aware that your client had a compromised immune system. She was not also aware that she even had asthma. Is that right? No, Your Honor. I'd like to clarify. The record reflects that Lou Taylor denies knowing that Andrews had asthma.  But page ID 600 is an email dated March 17, 2020. This is from TriStars Human Resources Generalist to Lou Taylor. And it specifically provides the following employees have requested to work from home based on compromised immune systems. And it says, I have received doctor's notes from each person listed validating that they do have a valid concern. And under that email, it appears Christy's name.  Counsel, did you allege in your complaint that your claim was being brought under the Amendments Act to the Americans with Disabilities Act, the Amendments Act of 2008? Yes, Your Honor. Yes, Your Honor. Well, I understand, and you can tell me whether you addressed this in your complaint. As I understand, the 2008 amendments loosened the requirements considerably in favor of the plaintiff so that the plaintiff no longer has to meet the regarded as prong of the definition of disability. But a plaintiff need only show that he or she was terminated because of an actual or perceived impairment. Plaintiffs no longer need to show that the employer perceived that the disability substantially limited a major life activity. And that's under 42 U.S.C. Section 12102. Parent three parent capital aid. So the definition of substantially limits under the definition. The amendments provide that the employee is now prohibited from considering the mitigative effects of mitigating measures. And I understand your client used an inhaler from time to time. Did you make these sorts of provisions of the statute clear in your pleadings? I believe we clarified it in our briefing at the motion for summary judgment, Your Honor. The court is correct in noting that there were changes in 2008, not only to the statute, but also to the Code of Federal Regulations, which became enacted in 2011 to conform with what the ADAA stated. And there it completely altered the analysis for substantially impaired by making numerous rules of construction, including, and I'll direct the court's attention to 29 CFR 1630.2J. There are several particular provisions under that J156. The determinations whether an impairment substantially impairs a major life activity shall be made without regard to the ameliorative effects, which Your Honor just commented on within reference to the statute. There's also a change in J17. An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. So that is relevant to this case because the defendant argues that the client's active lifestyle undercuts the disability. However, that provision provides that in combination those two provisions provide when she takes medication and her performance is not harmed. That is not enough to escape the definition of disability. What was her primary job before she got laid off for this COVID problem with the employer? So she worked as a team coordinator slash Amex liaison. And they were responsible for maintaining checklists and schedules. And as an Amex liaison, she was required to be available to help clients and the people who work for the clients deal with any issues with their Amex credit cards. So she could work fine before that, right? So there were some very important facts in this case is that Ms. Andrews, prior to the pandemic, had a laptop and was allowed to carry the laptop home. And she was performing her Amex liaison responsibilities at home. So she had been doing her job from home. Another aspect of their operation is that TriStar operates two offices, one in Los Angeles and another in Nashville. And they regularly engage with each other remotely via email and phone calls in servicing their clients. Counsel, in what ways did her asthma substantially limit her major life activities? So one of the changes to the act was major life functions was added to the definition. Functions, OK. How did her asthma effect substantially limit her major life functions? OK, so it would impact her ability to breathe and her ability to stave off respiratory illnesses because the condition involves an immune response to stimulants. That's what causes the constriction. So any impairment of breathing would be a disability under the ADA, is that it? I think there's a lot more of the cases would have to fall within the scope of the disability. Specifically because of the changes to the CFR and recognizing that even when the disability is not manifesting, the question is absent the non-mitigating measures and the ameliorative effects, whether her breathing would be impaired and whether her ability to fight off immune, her immune system to fight off respiratory illnesses. Was her breathing, I mean, she used the rescue inhaler on occasion, not even every day. I mean, your argument is just occasional use of the rescue inhaler? She's disabled because of that? Your Honor, I'm out of time, but may I continue answering? It's up to Judge Clay. I'm sorry. Well, yeah, you can continue. And while you're answering, maybe you can expand your answer, certainly address Judge Griffin, but if you could also encompass this provision of 42 U.S.C. section 121024D, which I understand means that under the Amendments Act of 2008, the definition of disability is not to be based on whether there's an episodic impairment that just happens from time to time. That's no longer relevant to determining whether the impairment substantially limits a major life activity. Instead, the relevant inquiry now encompasses whether the impairment substantially limits a major life activity when active. So I guess one question here is what definition are we using? Are we going by this definition in the Amendments Act, or are we doing something else? And you can address all those things if you like. Yes, Your Honor. So to be clear, the impairment here is her asthma, and the life functions is the respiratory system and the immune system as they operate together. The question about the occasional use of her inhaler, that is what the defendant chose to focus on in their briefing into the court linked onto. But there's also evidence in this case that my client took daily medications to help keep her asthma well-controlled. That was a daily thing that she had to do. The testimony is that she's also had it since she was 14, so the duration, which is one of the factors considered under regulations of being with a disability. And then with respect to which definition are we operating under, we believe that we satisfy all three of the definitions of disability, including regarded, actual, and record of. All right. Okay, you're out of time. We can hear from your opposing counsel. Thank you, Your Honor. Good morning, Your Honors. I'm Betsy Hart. I'm here with Kara Slafford on behalf of the Appalachian TriStar Sports and Entertainment. May it please the Court. Your Honors, I do want to clarify one thing. My opposing counsel just mentioned that Ms. Andrews had a laptop at the time that her employment was ended in March of 2020. She did have a laptop. However, the undisputed proof is that she had that laptop to use for her Amex duties after hours. And the testimony in the record is that she used that to log on to an American Express website when clients had needs after hours. The undisputed proof is that team coordinators did not work from home on a regular basis before the pandemic, during the pandemic, or after the pandemic. This position involves access to sensitive client information, but it's also a collaborative position. They work together. Team coordinator, the word team is right there in the name. So they need to be on-site in order to effectively do this job on an occasional day at home. They may be able to work around, but accessing this information. And it's also an administrative position. It involves filing, copying, scanning, things like that that simply have to be done on-site. So she did have a laptop, but that laptop was not equipped for working from home on a permanent or at least indefinite basis. Did her employer furnish the laptop or did she furnish it herself? I believe TriStar furnished the laptop.  I was going to say, what about other people? Others do work at home, or is she the only one that did that? There were a few employees that worked from home. Almost everybody worked in the office. There were a few employees that had laptops, but even her supervisor, a couple levels up, testified she didn't know if she had a laptop at that time. So some people had laptops. Some people had desktops. But it's undisputed that team coordinators did not work from home on a regular basis. They could not perform those team coordinator duties without eliminating an essential function, which was being physically present and available for the team. Council, in terms of the issue of working from home, did the employer engage in what we refer to as an interactive process in discussing with the planning for account of accommodations she would need, if any, for her disability and have those discussions with her? Thank you for that question, Your Honor. It is undisputed TriStar did not engage in that interactive process, and there's a couple reasons for that. Number one, the process was not triggered. Ms. Andrews did not request an ADA accommodation. What she requested was to work from home because of a fear of COVID. The evidence in the record shows that she asked her PCP on March 15th, I believe, which was the Sunday before that week she was laid off. She asked her primary care provider whether she needed to take any precautions, whether she should stop taking her medication. Her testimony was that her fear was that her asthma medication made her more susceptible to COVID-19. She asked her PCP about that. Her PCP responded and said, wash your hands, stay home if you have symptoms, and work from home if you're able to. But she did not say, you are at a higher risk than the rest of the population. She did not say, you need to stay home, do not go outside. If you catch this, you are going to get very sick. She didn't say any of that, but Ms. Andrews had already decided on her own that she was entitled to work from home. So she did request to work from home, but our position is that that was not a request for an ADA accommodation. It was simply a request to work from home because of a fear of COVID. And your honors, if we all got to work from home in 2020 because we were afraid of COVID, if the ADA required that, that would have crippled businesses immediately. That's simply not enough to justify an accommodation under the ADA. You are good. Go ahead. Just by way of background here, the record seems to suggest that the employer asked the workers which of them wanted to or needed to work from home. And subsequently, everyone who said they wanted to work from home or needed to were terminated from their employment, including the plaintiffs. Is that what happened? Can you explain how that unfolded? Yes, your honor. First, I would like to clarify that everybody that requested to work from home was not terminated. Ms. Taylor, who is TriStar's CEO, had divided employees into essential employees who were necessary to keep that business afloat and non-essential employees, which Ms. Andrews fell into that category because this was more of an administrative position. So essential employees that requested to work from home, many of them were allowed to work from home. TriStar equipped them. Undisputed, it cost TriStar about $200,000 to do that. But TriStar did equip some of its essential employees to be able to work from home. And TriStar did send this letter out soliciting requests to work from home. But while that was happening, that letter was going from HR, Yolanda Simpson, while Ms. Taylor, the CEO, was trying to figure out how am I going to keep this business afloat when I have just lost 25% of revenue overnight. So she knew she was going to have to reduce her workforce by some amount. And if it's the timing of the letter versus Ms. Andrews' request to work from home, they're very close in time. But if Ms. Andrews' position is that she needed to work from home because of COVID, if she needed this accommodation, then the letter should not have affected that timing. The letter shouldn't have had anything to do with that. If her position is that she was entitled to an accommodation because of her asthma or for whatever reason here, the letter shouldn't have affected that. Presumably she would have sent that request to work from home anyway. So this was not some sort of bait and switch. It was just a lot of things happening at once. This was March of 2020, the very beginning of the pandemic in the U.S. Absolute chaos, absolute mayhem. Nobody could have planned for this. Nobody predicted it. TriStar is doing the best it can to keep the business afloat while also hoping to accommodate these employees that absolutely cannot come in. But TriStar was not able to accommodate everyone. Did she say that she needed to work from home because she was fearful that her immune system was more compromised because of the asthma? Did she communicate that or not? No, Your Honor. There were two requests, two documents where she's requesting to work from home. The first one is an email where she says, I have a quote, may I please be, I'm paraphrasing, but may I please be approved to work from home because I have a doctor that is, quote, pissed at me for not staying home. So first of all, we now know that that was a lie. There is no doctor. The doctor that she brought up in that email was her best friend, Emily, who's a wound care nurse in Florida and does not provide treatment. But that email, even based on the information TriStar had at that time, even if that email were true, it didn't say anything about her immune system. It didn't say anything about her having breathing difficulties, nothing to put TriStar on notice that she had a substantial impairment. And then the second time or the second communication about her requesting to work from home is when she sent in this note from her nurse practitioner, Autumn Nelson. Miss Nelson says she has known asthma. It's well controlled. Because of the rising risk of the COVID-19 pandemic, she would benefit from working from home. But there's nothing in that note to suggest that she would have benefited from working from home more than the rest of the general population at that time. There was nothing about breathing difficulty or immunocompromise or anything even to suggest that she was going to get sicker than any other person because of the COVID-19 pandemic or because of any condition that she had. But the HR person lumped everybody together that requested to work at home and labeled them as immune-compromised. Correct. And again, this is... Why did she do that? That's a good question, Your Honor. And again, this is March 2020, so this is just absolute fire drill every day. TriStar didn't have some sort of plan in place to deal with a global pandemic and to deal with the loss of this business, the sudden loss of this business. And yes, that is correct. Miss Simpson put everybody that requested from home into one of three categories. It was child care, the employees' own health reasons or health reasons of a family member. And it's because it was March of 2020. She's doing the best she can. They've got to lump everybody into some sort of category. And it wasn't her job to say whether an employee really was immunocompromised or whether a family member really was immunocompromised. It was her job to collect that information and organize it in a manner that TriStar could use to figure out how are we going to survive this pandemic, how are we going to keep this business afloat when we have had 25% of our revenue just vanish overnight. I think that the loss of that revenue is very important here, too. We've heard a lot about Miss Andrews' disability. We briefed it. TriStar's position, of course, is that Miss Andrews does not have an ADA disability under any of the three definitions. But even if we get past all of that, even if she were able to establish a prima facie case of discrimination all the way up to this reduction in force, there is no evidence that Miss Andrews was singled out. There is absolutely no evidence she was singled out. Thirty-three people were terminated of those about half were on work from home and about half were not on a work from home status. On the day she was terminated, March 20th of 2020, ten people total were laid off. Six of those had been on a work from home status or had requested to work from home. Four had not. So, again, we're almost split down the middle there. There's no evidence that Miss Andrews was singled out for inclusion in this reduction in force. And even if we got past that element of the prima facie case where there is a RIF, TriStar's stated reason this reduction in force is undisputed. It's undisputed that 33 employees were laid off. It's undisputed TriStar lost 25% of its revenue because of the COVID-19 pandemic, and there is no evidence in the record that that was pretextual or that somehow Miss Andrews was special and got singled out to be included with these other 33 people. The fact is TriStar was trying to figure out a way in this mass chaos to keep its business afloat. Some employees had to be laid off, and Miss Andrews happened to be one of them. I don't recall, did the district court rule on the case based upon the lack of a prima facie case, or did the district court go to the next step? The district court found that Miss Andrews could not establish a disability under either of the three definitions, and that is where the district court's analysis essentially stopped. That's what I thought. Yeah. Do you have anything further? Your Honors, I'm sorry, Judge Clay. No, I'm just asking if you had further argument. Well, I think that the most important thing is to look at who was laid off here, Your Honors, and look at the evidence that even if we have any type of fact of speech, which we do not, but even if this court finds that there are fact of speech on that prima facie case, there is enough evidence in the record. The record supports summary judgment, so even if we need to go through and analyze the prima facie case, there is just no way a reasonable jury could find that Miss Andrews was either discriminated against because of her disability or failed to accommodate her. There's no way of getting around this reduction in force. There is no evidence that Miss Taylor, who was the decision maker, knew of any disability. Of course, there wasn't a disability. If there were, there is no evidence Miss Taylor had any knowledge of that, especially in light of the circumstances, it being March 2020. Miss Taylor doesn't have time to consider at this point in time whether we have a disability or what the reasons are that we're working from home at this stage. Everybody is lumped together. She testified she didn't consider what reasons anybody was requesting to work from home. Everybody there was lumped into one category, and that is how the rift started. The record is sufficient, Your Honors, to establish summary judgment. The district court got it right. Summary judgment is appropriate on all claims, and we would ask that that be affirmed. All right, thank you very much. Thank you, Your Honors. We'll have rebuttal if there is a rebuttal. In response to the defendant's claim that there's a reduction in force is the reason that Andrews turned employment. There is no evidence that any type of analysis was done with respect to a dollar-cents approach. Lou Taylor's testimony said that in the first round, her primary consideration for laying off individuals was whether they request work from home. In here, that was couched with the medical notes demonstrating that there is a medically valid reason determined by the human resource representative. You admit other people were laid off at the same time, at least under the guise or whatever it was that the company needed to lay them off, like other companies laid off people, right? There are other people, and a large number of those individuals or a significant portion of those individuals were also people who submitted documentation related to a compromised immune system. But you didn't submit any evidence of a compromised immune system, did you? Her testimony... No, you didn't, to the employer. They submitted a note that was all that was required. The note doesn't say anything about a compromised immune system. The note establishes a disability, which is asthma, and then links it to COVID-19. There's no requirement for any magic words or... Well, I mean, the note doesn't mention a compromised immune system, does it? It does not mention an immune system. I can read it to you if you want. No, I've read it. I appreciate it. That is all that is required to initiate the obligation on the employer to engage in the interactive process. If the employer had done what it was supposed to do, which it did not, it could have inquired as to the certain things related to the request for accommodation. But as is well established in the CFRs and in the case law, there are limitations on that. Here, when there is... While an employer is not required to provide alternative obligations or alternative accommodations, the failure to do so is evidence of lack of good faith in engaging in the interactive process. Here, the letter that TriStar sent out to employees suggested working from home would be a considered accommodation. At no point did Andrew say, this is the only accommodation that I would consider. It was proposed like that to the employer. The employer could have said, or should have done an individualized inquiry into it, and it did not do so. And one of the things in the letter sent to employees indicated that they would consider other options, and I believe the option was a modified work schedule. When the interactive process breaks down, it is the responsibility of this court to allocate liability on the individual or the entity that was responsible for the breakdown. And in this case, defendant admits that in their discovery responses, that they did not engage in the interactive process at all. But I thank you, Your Honors, for your time. Thank you very much, and the case is submitted.